BALTIMORE GAS AND ELECTRIC
COMPANY, a body corporate, and
Bankers Trust Company

v.

UNITED STATES FIDELITY AND
GUARANTY COMPANY, a Maryland
corporation, National Fire Insurance
Company of Hartford, a Connecticut
corporation, Royal Insurance Company,
Limited, a body corporate of the Unit-
ed Kingdom of Great Britain and North
Ireland.

Civ. No. 9814.

United States District Court
D. Maryland,
Civil Division.

Oct. 9, 1958.

See, also, 159 F.Supp. 738.

Richard F. Ober, Wilmer H. Driver, and William Baxter, Baltimore, Md., for plaintiffs.

Charles Markell, Jr., George M. Radcliffe, and Markell, Veazey & Gans, Baltimore, Md., for defendants.

THOMSEN, Chief Judge.

This action on three identical, unusual insurance policies is before the court on motions for judgment filed by plaintiffs and defendants respectively after a jury answered several questions of fact submitted to it but declared itself unable to agree on the answer to one of the questions.

Among other coverages, the policies insure against explosion, and against direct loss to electrical equipment or devices resulting from any artificial electrical disturbance immediately preceding and causing such explosion, provided the direct loss caused by electricity and ensuing explosion exceeds $200. Defendants concede that a series of artificial electrical disturbances caused substantial damage in the selector switch compartment and in the main tank of a large

electrical transformer which was part of the equipment insured under the policies.[1]

The principal issues are: did an explosion or explosions follow and result from any artificial electrical disturbance in the main tank or the selector switch compartment; if so, whether that explosion caused any direct loss to electrical equipment or devices; and whether that explosion satisfied the requirements of the policy and endorsements which must be met before recovery may be allowed for loss resulting from an artificial electrical disturbance; again, if so, whether any direct loss to electrical equipment or devices in either the selector switch compartment or the main tank, or both, was proximately caused by an artificial electrical disturbance which preceded and caused the explosion; and whether all of the damage in the main tank was proximately caused by such a disturbance.

The three policies on which these actions were brought constitute all of the insurance against the risks which they covered. Each of the policies insured plaintiffs' property to the amount of $73,062,000. Each is written basically on the New York standard form of fire insurance policy, commonly used in Maryland, to which several endorsements are attached. The provisions of the policies and endorsements are identical.

The basic insuring provision is "against all Direct Loss By Fire." An Extended Coverage Endorsement insures, inter alia, against explosion. This endorsement is modified by an Extended Coverage Conversion Endorsement, which is specifically designed for the insurance of electric utility property and provides:

"The coverage of loss by explosion under this endorsement shall include direct loss by any artificial electrical disturbance immediately preceding and causing such explosion * * *

"The following are not explosions within the intent or meaning of these provisions:

"(a) Concussion unless caused by explosion
"(b) Electrical arcing
"(c) Water hammer
"(d) Rupture or bursting of water pipes * * * *"

The Extended Coverage Endorsement directs that in applying policy provisions, including other endorsements, to the perils insured against by that endorsement, "wherever the word 'fire' appears there shall be substituted therefor the peril involved or the loss caused thereby." Thus, substituting the word "explosion" for the word "fire" in Electrical Apparatus Clause "B", that clause reads:

"1. This Company shall not be liable for loss resulting from any electrical injury or disturbance to electrical equipment or devices caused by electrical currents artificially generated unless *explosion* ensues in electrical equipment or devices covered under this policy and then shall be liable only for direct loss to electrical equipment or devices located on the premises where such ensuing *explosion* occurs; but if such *explosion* does ensue, then, in consideration of the rate of premium at which this policy is written, this Company shall be liable for its proportion of direct loss caused by electricity to the said electrical equipment or devices, provided such direct loss caused by electricity and such ensuing *explosion* exceeds the sum of $200, * * *."

The claim is for damage to a large transformer at the Electric Company's Philadelphia Road Substation, which oc-

1. The transformer and its associated equipment were owned by plaintiff Electric Company. Bankers Trust Company, as trustee for certain mortgage bondholders of the Electric Company, was joined as a plaintiff.

curred on August 1, 1956. We are concerned particularly with the selector switch compartment and the main transformer compartment (main tank) of the transformer. Both were metal casings containing electrical equipment. The compartments were contiguous, but there was no communication between them except wires for the transmission of electric current. The main tank contained no moving parts. It contained the heavy cores of all three phases of the transformer, around which high voltage insulated copper wiring was wound in tight coils. The equipment in the selector switch compartment included moving contacts, which in ordinary operation repeatedly made and broke electrical contact with stationary contacts in the compartment. The contacts controlled the number of windings in the main tank through which electric energy was transmitted, and when a change was made, the actual making and breaking of electrical contact, with resultant sparking or arcing, occurred in a third compartment, the transfer switch compartment, which is not involved in this case. In both the main tank and the selector switch compartment the electrical equipment was completely submerged in insulating oil. There was a space between the oil and the top of the main tank which contained nitrogen at the time of the accident. The selector switch compartment contained no nitrogen, but had an empty air space between the top of the oil and the top of the tank.

Each compartment had a diaphragm relief device; we are concerned with the one in the selector switch compartment. This consisted of an opening in the top of the compartment with a metal covering over a micarta diaphragm which would rupture or break upon sufficient increase in pressure in the compartment. The pressure would also open the metal cover, which would return to its original position, by operation of springs, after the pressure was reduced. The purpose of this device was to provide a deliberate weak spot in the casing, where pressure could be relieved and a bursting of the compartment itself be thus prevented. A pressure of more than 15 lbs. per sq. in. would have been required to rupture the compartment itself, but the relief device was so constructed that the micarta diaphragm would shatter at a pressure of 12 to 15 lbs. per sq. in.

After poor electrical contacts between the movable arm and the fixed terminals of the A-phase of the selector switch apparatus had prior to August 1 created a "creepage path" or carbonized conducting path between fixed contacts 11 and 13, a major electrical disturbance, consisting of a "power arc" or short circuit, occurred between those two contacts in the selector switch compartment at 5:31 p.m. on August 1.

This arc induced other electrical arcs in the selector switch compartment, which "climbed" through the rigid conductors or bus bars, damaging them and the insulating board. The first short circuit or arc was of sufficient intensity to generate great heat in its immediate vicinity; the other arcs had similar effects. This heat vaporized some of the surrounding insulating oil, decomposing some of it into gases of various hydrocarbon contents. Expanding volume rapidly built up such pressure in the selector switch compartment that the relief diaphragm burst. All of this occurred in a very short period of time, "some few micro-seconds."

In the main transformer tank, the immediate effect of the short circuit between contacts 11 and 13 in the A-phase of the selector switch apparatus was a short circuit or "turn-to-turn failure" in that section of the high voltage windings between the points of connection of the leads to the main windings from those two short circuited contacts. Great heat was generated, insulating oil was vaporized and decomposed into gases, which built up pressure but did not rupture the main tank or its relief device. The heat of the arc also distorted the coils of the high voltage windings, decomposed some of the insulation of the windings, and melted the

copper of the conductors in a five inch circle in Coil No. 2.

The major item of damage in dollars was caused by small particles of copper and carbonized insulation becoming imbedded in the high voltage windings of all three phases in the main tank. The question is: how were the small particles of copper disseminated throughout the windings? Plaintiffs' experts were of the opinion that melted copper from the windings of the A-phase was violently expelled with explosive force into the windings of the other phases and into other parts of the windings of the A-phase. Defendants' experts were of the opinion that the particles floated in the insulating oil, carried by convection or thermal currents to the points where they ultimately came to rest.

The evidence indicated that there were successive short circuits in the main tank over a period up to 31 minutes, but the original short circuit caused the greatest amount of copper to be melted.

The relay switch automatically cut off the flow of current from the transformer to the distribution feeders but the transformer itself remained fully energized during subsequent switching operations until it was finally disconnected. The signal which should have shown that the relief diaphragm in the selector switch compartment had been broken did not function. At 5:42 one of plaintiffs' employees, therefore, threw on the current. It was cut off again automatically at 5:44, and was again restored. It was cut off for the last time at 5:50, and thereafter the transformer was disconnected and completely deenergized by the opening of other switches at 6:02.

The following questions of fact were submitted to the jury. The jury answered the first four questions as shown below. In view of the answer to the fourth question, it was unnecessary for the jury to answer the fifth question. They were unable to agree on the answer to the sixth question.

"1. Did an explosion or explosions follow and result from any artificial electrical disturbance in the main tank or the selector switch compartment? Yes  x  No _____

"If the answer to Question 1 is 'no', it is unnecessary to answer the other Questions. If the answer to Question 1 is 'yes'—

"2. Did any such explosion or explosions occur in the selector switch compartment? Yes  x  No ———

"3. If the answer to Question 2 is 'yes', did such explosion or explosions cause any damage? Yes  x  No ———

"4. Did any such explosion or explosions occur in the main tank? Yes ——— No  x

"5. If the answer to Question 4 is 'yes' did such explosion or explosions cause any damage? Yes ——— No ———

"6. The amount of damages sustained by plaintiff as a result of electrical disturbance and explosion.  $———."

Each side has moved for judgment in its favor on each of the issues and on the case as a whole. Defendants have also moved for a new trial. The construction of the policies presents some questions of law and some mixed questions of law and fact. The parties are agreed that in ruling on the motions for judgment the court shall determine all questions of fact not submitted to the jury, but shall be bound by the findings of the jury, except insofar as one side or the other may have been entitled to a directed verdict to the contrary on one or more of the questions, and therefore now entitled to a judgment n. o. v. on that question or questions. The parties do not agree that the court may fix the amount of the damages to which plaintiffs may be entitled unless the court shall find that plaintiffs are entitled to

a directed verdict on that issue (Question 6) as a matter of law. Union Pacific Railroad Co. v. Bridal Veil Lumber Co., 9 Cir., 219 F.2d 825, certiorari denied 350 U.S. 981, 76 S.Ct. 466, 100 L. Ed. 849.

Plaintiffs were not entitled to a directed verdict on Question 4. There was evidence legally sufficient to support the jury's negative answer to that question. Whether defendants were entitled to a directed verdict on Questions 2 and 3 presents a more difficult problem.

Defendants conceded that if there was an explosion or explosions in the selector switch compartment, such explosion or explosions followed and resulted from an artificial electrical disturbance. The disputed question was whether there was any explosion at all. Plaintiffs conceded that if there was an explosion in the selector switch compartment it caused no damage except the rupture of the relief diaphragm.[2] The damage to the electrical equipment in the selector switch compartment was caused by the arcing, which was an artificial electrical disturbance immediately preceding and causing the alleged explosion, but which could not be considered an explosion itself under the provisions of the Extended Coverage Conversion Endorsement.

The parties agreed that if the jury found that there had been an explosion which caused some damage, the judge should decide, on motion for judgment, whether such explosion and resulting damage would be covered under the policies and endorsements. Subject to this understanding the parties further agreed that the judge should instruct the jury as to the meaning of the word explosion, as used in the policies. The instruction given was based primarily upon Empire State Ins. Co. v. Guerriero, 193 Md. 506, 511, 69 A.2d 259, and Tires, Inc. v. Travelers Fire Ins. Co., 4 Cir., 253 F. 2d 411, 413; neither party excepted to it.[3]

The jury found that there was no explosion in the main tank, but that there was an explosion in the selector switch compartment, which caused some damage. Under the undisputed facts, that damage could only have consisted of the rupture of the relief diaphragm and the splashing out of a trifling amount of oil. The findings of the jury plus the undisputed facts have therefore established that all of the loss and damage to the electrical equipment both in the main tank and in the selector switch compartment was caused by one or more artificial electrical disturbances. So, the principal question for decision on these motions is whether such an explosion, causing only that kind of damage, satisfies the requirements of the policy and endorsements which must be met before recovery may be allowed for loss result-

2. There was some evidence from which the jury might have found that the micarta diaphragm had been ruptured before August 1, but the answers of the jury to Questions 2 and 3 amounted to a finding that the rupture of the diaphragm occurred at that time.

3. The instruction read as follows: "The word 'explosion', as used in the policies, is to be understood in the sense that it is used by ordinary men and not in any technical or scientific sense.

"So considered, 'explosion' means a violent bursting with noise following the production of pressure or a sudden release of pressure. There must be pressure for an explosion to take place. However, the amount of the pressure need only be sufficiently great to produce a sudden and violent release of pressure. There must be also noise but it need not necessarily be loud, for the amount of noise depends upon the type and size of the explosion. You may have a big explosion or a little explosion. In the sense in which the word 'explosion' is used in these policies, there must be a building up of pressure and, as a direct result thereof, an expansion, so that the pressure can no longer be contained, but bursts forth out of the vessel or into some other part of the vessel.

"Not every rupture is an explosion. On the other hand, you may have an explosion without a rupture of the vessel in which the pressure is generated if sufficient pressure is developed in some part of the vessel to cause a sudden and violent release of pressure from that part of the vessel into the vessel as a whole or some other part of the vessel."

ing from an artificial electrical disturbance.

■ Under the Maryland law, which controls this case, contracts of insurance, like other contracts, are construed with a view of arriving at the intention of the parties as gathered from all the instruments. They, like other contracts, must receive a reasonable interpretation consonant with the apparent object and plain intent of the parties. Leeds, Inc., v. Aetna Casualty & Surety Co., D.Md., 40 F.Supp. 966, 969, Chesnut, J.; Hankins v. Public Service Mutual Ins. Co., 192 Md. 68, 84, 63 A.2d 606; Levy v. American, etc. Ins. Co., 195 Md. 537, 541, 73 A.2d 892. Only if the provisions are ambiguous should they be construed most strongly against the insurer. Moreover, in the instant case the plaintiff is not an individual householder, required to take whatever policy form the insurer offers, but a large company, able itself or jointly with other utilities to bargain on an equal basis with insurance companies on the wording of endorsements.

The policies insure against fire and the additional hazards listed in the Extended Coverage Endorsement, including explosion. Artificial electrical disturbance is not one of the additional hazards listed in that endorsement. Losses resulting from artificial electrical disturbance are covered only insofar as they come within the provisions of Electrical Apparatus Clause "B", as modified by the Extended Coverage Endorsement, or of the Extended Coverage Conversion Endorsement. All of these provisions are quoted above.

These provisions indicate that the parties did not intend the policies to cover artificial electrical disturbance except in conjunction with fire or explosion or one of the other hazards listed in the policy or the Extended Coverage Endorsement. Electrical Apparatus Clause "B" applies whether the artificial electrical disturbance occurs in connection with fire or with one of the hazards listed in the Extended Coverage Endorsement. The apparent purpose of Clause "B" is

to govern situations where it may be difficult or impossible to tell what part of the loss was caused by an artificial electrical disturbance and what part by the ensuing fire, explosion or other listed hazard. Clause "B", therefore, allows recovery under the policy not only for the loss caused by the fire or other hazard but also for direct loss "caused by electricity to the said electrical equipment or devices, provided such direct loss caused by electricity *and* such ensuing explosion exceeds the sum of $200." (Emphasis supplied). The proviso just quoted indicates that Clause "B" does not contemplate or deal with a situation where all of the loss to the electrical equipment or devices is caused by the artificial electrical disturbance and none of that loss is caused by fire or explosion or other listed hazard.

In the instant case, we must also consider the Conversion Endorsement, which was specifically designed for the insurance of electric utility properties. That endorsement provides, inter alia: " * * The coverage of loss by explosion under this endorsement shall include direct loss by any artificial electrical disturbance immediately preceding and causing such explosion * * * The following are not explosions within the intent or meaning of these provisions: * * * (b) Electrical arcing, * * * Any other explosion clause made a part of this policy is superseded by this endorsement." The question is: does this provision mean that the insurer shall be liable for loss caused by artificial electrical disturbance, where the only explosion was the rupture of a relief diaphragm, a safety device which operated exactly as it was intended to operate in order to prevent the rupture or bursting of the selector switch compartment itself?

The jury found that an explosion within the definition given in the court's instructions occurred in the selector switch compartment of the transformer. But on this motion for judgment n. o. v. the court must consider whether defendant was entitled to a directed ver-

dict on that issue; in other words, whether that alleged explosion was such an explosion as would permit recovery under the policy and endorsements.

As we have seen, the electrical arcing, which was an artificial electrical disturbance, cannot be considered an explosion within the meaning of the policy and endorsements, even if it could be so considered apart from the specific language of the Conversion Endorsement. Therefore, the alleged explosion in the selector switch compartment could only consist in the release of pressure through the rupture of the micarta diaphragm in the relief device. That device was installed to take care of the pressures which are necessarily created if arcing occurs in the insulating oil. If the relief device had consisted solely of a valve which opened when the pressure rose to a certain point and closed when the pressure was relieved, it would be clear that there was no explosion within the meaning of the policy. In the instant case, however, the relief device included a micarta diaphragm, which ruptured when the pressure reached a certain point, and prevented a bursting of the compartment itself. After considering all of the relevant policy provisions, I conclude that the parties did not intend to insure against a loss, all of which was directly caused by an artificial electrical disturbance, where the only explosion which ensued was the release of pressure through the rupture of a diaphragm in a relief device which operated as it was intended to operate, and where that explosion caused no direct loss to the electrical equipment or devices except the rupture of the relief diaphragm.

The instant case bears some analogy to the so-called "friendly fire" cases. American Towing Co. v. German Fire Ins. Co., 74 Md. 25, 21 A. 553. Since the alleged explosion was merely the intended functioning of the safety device and caused no loss or damage except what was necessarily involved in the operation of that device, it was a "friendly", i. e. an intended explosion.

After deliberating several hours the jury asked whether the release of steam through an emergency valve on a hot water heater would constitute an explosion. I did not answer the jury's question "no", because an affirmative answer by the jury to Questions 2 and 3 would necessarily include a finding that the micarta diaphragm had not been broken before the accident, which was a disputed question of fact which might or might not be important, depending upon the final construction of the policy. But I am satisfied and now rule that the jury's question should have been answered with an unequivocal "no", and that since neither the electrical arcing nor the release of pressure through the rupture of the micarta diaphragm in the safety device amounted to an explosion within the meaning of the policy and endorsements, defendants were entitled to a directed verdict on Questions 2 and 3.

This conclusion requires a judgment in favor of defendants. But since on appeal this conclusion may be held to be erroneous, I will rule on the other questions presented.

■ If it should be held that the release of pressure through the rupture of the relief diaphragm was an explosion which satisfies the requirements of the policy and endorsements which must be met before recovery may be allowed for loss resulting from an artificial electrical disturbance, the undisputed evidence shows that all of the direct loss to electrical equipment or devices in both the selector switch compartment and the main tank was proximately caused by an artificial electrical disturbance which preceded and caused such explosion. There is no evidence from which the jury could properly have found that the action of the Electric Company employee in restoring the current at 5:42 p. m. and 5:48 p. m. was an intervening cause which broke the chain of proximate causation, or which caused any loss in the main tank which would not otherwise have occurred. The undisputed evidence shows that the

Electric Company spent $92,798 for repairs; there was no dispute about the reasonableness of the cost, except with respect to one item of some $1,000, which the parties are agreed is too small to argue about. A federal judge can direct a verdict in favor of the party having the burden of proof. Slocum v. New York Life Ins. Co., 228 U.S. 364, 369, 33 S.Ct. 523, 57 L.Ed. 879; United States v. Grannis, 4 Cir., 172 F.2d 507, 513. Clause "B" provides that the assured shall assume the first $200 of damages. Therefore, if plaintiffs are entitled to recover under the policies, they are entitled to a directed verdict for $92,598.

If it should be held on appeal that a new trial should be had on any issue, a new trial should be granted on all issues.

However, for the reasons stated, judgment should be entered in favor of the defendants. It is so ordered.